Filed 6/2/14  Davis v. Rael CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID M. DAVIS, as Trustee, etc., | B244897 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BP080564) |
| v. | |
| MARK RAEL, | |
| Defendant and Respondent. | |

APPEALS from orders of the Superior Court of Los Angeles County. Reva G. Goetz, Judge.  Affirmed in part, reversed in part, and remanded.

Mazur & Mazur, Janice R. Mazur, William E. Mazur, Jr., for Plaintiff and Appellant.

Niddrie, Fish & Addams, David A. Niddrie for Defendant and Respondent.

_____

A trust beneficiary claimed that the trustee mismanaged assets and charged excessive fees. The trial court ruled in favor of the beneficiary and ordered the trustee to pay $1.2 million.[1] After examining the record, we affirm in part, reverse in part, and remand for a new trial on two issues.

## FACTS AND PROCEDURAL HISTORY

In 1993, Tony G. Rael, Jr. (decedent), created an inter vivos trust (the Trust) with his wife, Toni B. Rael, for the benefit of their three children. After being widowed, decedent married Cruz Cardenas in 2000. In March 2002, decedent executed a will and amended the Trust. He declared that the assets in his estate and Trust are his separate property. His trustee, upon decedent's death, was directed to pay the mortgage on Cardenas's personal residence (up to $100,000) and allow Cardenas to operate decedent's liquor store in Old Town Pasadena rent-free for two years or until the business was sold.

In 2002, decedent's son, respondent Mark Rael, petitioned to become his father's conservator. Decedent opposed the petition. Decedent's wife, Cruz Cardenas, filed a counter-petition to be appointed conservator. Decedent consented to Cardenas's appointment, and declared that he "does not want his son, Mark Rael, to be his conservator under any circumstances." Apart from his wife, decedent nominated as conservators his daughter or appellant David Davis (the Trustee).

The trial court found that decedent was unable to take care of himself or his financial affairs, and appointed Cardenas as decedent's conservator. Letters of Conservatorship were issued on August 22, 2002. In January 2003, Cardenas declared that decedent's assets were appraised at $1,582,109.

When the conservatorship was established, appellant Davis became trustee of the Trust. He continued as trustee after decedent's death. The Trustee manages client

---

[1] Although his brief refers to a challenge by the "beneficiaries," Mark Rael alone objected to the trustee's actions: he was not joined by the other beneficiaries in the trial court or on appeal. Throughout his brief, respondent cites the trial court's decision as proof of his claims. The decision is not evidence: the evidence is contained in the 13 clerk's transcripts, the seven reporter's transcripts, and the appendix.

financial portfolios, but has no experience running commercial properties.  He attended a banking school and worked in a bank trust department from 1965 to 1972.

The Trust does not specify a trustee's fee.  When approached to become trustee in 2002, the Trustee said he would charge a fee of 1 percent of the value of the Trust's "hard assets," and no fee for cash.  No one objected to this fee at a meeting that included decedent, Cardenas, and decedent's lawyer.

Decedent passed away on March 12, 2003.  His will directs that his lawyer designate an executor:  the lawyer designated the Trustee as the executor.  The Trustee petitioned to admit decedent's will to probate and to administer the estate.  Testamentary Letters issued on May 1, 2003.

In July 2003, Cardenas asked the trial court to enforce a settlement agreement allegedly reached during mediation in April 2002, between Cardenas, decedent, and decedent's three children, in which decedent agreed to amend the Trust to give Cardenas a one-third interest in Trust assets.  The settlement was negotiated while the competing conservatorship petitions were pending.  Cardenas submitted a creditor's claim for one-third to one-half of decedent's estate, based on the alleged settlement agreement.

In March 2004, the trial court found that Cardenas's lawsuit for breach of the settlement agreement did not violate the no-contest clauses in decedent's will and Trust. The Trustee appealed the court's determination.  Respondent and his sisters separately appealed.  This Court affirmed the trial court's orders, finding that the settlement agreement was indicative of decedent's intent, and an action to enforce the agreement did not trigger the no-contest clauses in decedent's will and Trust.  (*Estate of Rael* (Jun. 1, 2005, B175075 [nonpub. opn.].)

In March 2004, respondent questioned the propriety of the Trustee's sale of Trust property on Pickwick Street in Highland Park (Pickwick).  The Trust attorney wrote to respondent's then-attorney, David Bunn, saying that "Your client, Mark Rael, has raised

questions with the Trustee regarding the sale price" of Pickwick.[2] The letter provides information about the "as is" sale to the tenants for $425,000 (including the leases, appraisal report, and inspection report) and offers further information if needed.

In 2002, decedent's assets were appraised at $3,023,500, and the Trustee's fee was based upon that figure. From 2005 to 2007, the Trustee was paid $6,750 per quarter. In 2007, his fee rose to $10,500 per quarter based on a reappraisal of a commercial building owned by the Trust on Holly Street in Pasadena performed by a broker/property manager who handled leasing for the property but is not an appraiser.

On August 5, 2005, the Trustee served the "First Account and Report of Administration" of the Trust (the First Account). The First Account covers September 2002 through April 2005. It states that several of decedent's real properties were sold by the Trustee to pay off tax liens and loan encumbrances owed by decedent. The Trustee did not obtain approval from the beneficiaries before selling the properties, and did not obtain formal appraisals. The Trustee received $72,495 as compensation for his trustee services, and disclosed that his sister received commissions from the sale of four of the properties, as a real estate broker. The First Account lists fees paid to accountants, appraisers, bookkeepers, payroll processors, and attorneys.

No distributions of assets were made to Trust beneficiaries, owing to Cardenas's pending claim that she was entitled to one-third of the Trust assets. On August 8, 2005, the Trustee served a notice of a hearing to obtain approval of the First Account: the notice was served on respondent at his home address and on the other beneficiaries (and their lawyers). The Trustee also filed a first and final account for decedent's estate. The Trustee's petition to confirm the estate account was served on the beneficiaries, including respondent, on August 16, 2005. A notice of continuance was served on September 15, 2005, and numerous times thereafter while Cardenas's civil suit was pending.

---

[2] The trial court described Bunn as "counsel for the beneficiaries" during 2004. In June 2005, the court granted Bunn's motion to be relieved as respondent's counsel.

4

On October 25, 2005, Cardenas served objections to the First Account on the Trustee and the Trust beneficiaries, including respondent. Among other things, Cardenas complained that Trust property "was sold below market value" by the Trustee's sister; the Trustee failed to provide information such as inspection reports that would reveal the condition of the properties at the time of sale; and the Trustee charged excessive fees for himself and the Trust attorneys.

At a hearing on December 2, 2005, the court approved partial payments to the Trustee and to the Trust attorney, and directed the Trustee to continue paying Cardenas a monthly family allowance of $3,700, a court-ordered obligation that began in May 2005. The trial court did not issue a final order approving the First Account, due to the ongoing Cardenas litigation.

Cardenas's lawsuit to enforce the settlement agreement—and obtain one-third of decedent's assets—went to trial in 2006. Cardenas lost, and the Trustee prevailed. Both parties appealed: Cardenas on the merits and the Trustee challenged the trial court's refusal to award attorney fees. Division Four of this District concluded that the trial court "did not err in excluding the agreement and finding it unenforceable." (*Rael v. Davis* (2008) 166 Cal.App.4th 1608, 1611.) The decision also upheld the trial court's refusal to award attorney fees to the Trustee. (*Id.* at pp. 1622-1623.)

Respondent spoke to Trust Attorney Matthew Brown in late 2008, regarding the second Cardenas appeal. Respondent asked Brown to take the necessary steps to close decedent's estate and Trust and distribute the assets to the beneficiaries. Brown threatened that if respondent did not agree to the accounting, he would make sure that respondent did not get paid for a long time. Brown denied making threats.

After remittitur issued in the second appeal, on November 26, 2008, the Trustee negotiated a settlement with Cardenas for $137,069 in which she agreed to relinquish her $2 to $3 million claim. Cardenas signed the settlement agreement on February 20, 2009.

In April 2009, the Trustee petitioned the trial court to approve the settlement and terminate Cardenas's family allowance.[3] The Trustee also asked the court to approve an agreement to pay the mediator involved in the Cardenas litigation. In May 2009, respondent informed the court that he approved of the settlement terms. In June 2009, Cardenas and the other Trust beneficiaries informed the court that they approved the terms of the settlement.

On April 6, 2009, respondent filed a verified petition to compel distribution of the Trust to the beneficiaries. He asked the court to take judicial notice of the First Account as the basis for showing that the Trust had sufficient cash to allow a distribution. Respondent noted that the dispute with Cardenas ended with a decision favorable to the Trust, and a settlement was reached that put to rest all remaining issues. Respondent asserted that he hired two attorneys in 2008, "regarding the status of the final accounting for the Trust"; the attorneys were told that the accounting was nearly complete.

The Trustee responded that a final accounting and distribution was delayed by the litigation with Cardenas, and could be completed after the trial court approved the settlement with Cardenas. The Trustee asked the court to sign an order approving the Cardenas settlement as soon as possible because Cardenas depended on the $3,700 monthly family allowance (which she agreed to give up) and a delay in paying her the settlement amount was causing her economic hardship.

The court verbally approved the settlement with Cardenas on June 5, 2009. That same day, the trial court ordered a preliminary distribution of $150,000 be made to respondent and his sisters. The Trustee was directed (in his capacity as executor) to file a final account for decedent's probate estate within 30 days. Once the estate was closed, the money would flow into the Trust. The court signed a final order approving the settlement on June 25, 2009.[4] The proposed order directing the Trustee to distribute

---

[3]     In June 2007, the trial court directed that Cardenas's family allowance of $3,700 monthly must continue "until further order of the Court."

[4]     The court signed an identical order on July 21, 2009.

money to the beneficiaries and prepare a final accounting was not presented for the court's approval until September 2009.

On July 30, 2009, respondent filed a motion to compel the Trustee to prepare a final accounting. Respondent complained that he has spent over $21,000 in legal fees "in an attempt to motivate Mr. Davis to perform his duties as executor and trustee." Respondent asked the court to set a timetable for the Trustee's performance. The trial court's probate notes observe that respondent failed to serve his motion on the Trustee or the other beneficiaries, so the matter was taken off calendar.

On September 11, 2009, the Trustee filed his final account for decedent's estate, covering the period since June 30, 2005. The Trustee requested statutory fees of $34,648 for himself and the attorney. He also requested fees for extraordinary services relating to both tax litigation and the Cardenas litigation. Respondent filed a "notice of no objection" to the final account and asked the court to approve it.

Before the hearing on the Trustee's final account, respondent filed a "verified notice of breach of fiduciary duty." Respondent claimed that the Trustee—after complying with a court order to transfer a commercial property to the Trust beneficiaries—failed to transfer the building's operating documents, such as leases and tax or maintenance records. Attorney Brown made promises to produce the documents but reneged on his promises.

In December 2009, respondent filed objections to the estate accounting that was filed and served in 2005. Respondent alleged that the Trustee paid excessive federal and state taxes of $200,222; collected only $8,342 in interest on a promissory note for $1.3 million; made excessive expenditures; failed to account for substantial cash receipts; and inaccurately valued assets. Respondent asked the court to disallow the account and order the Trustee to produce documentation of receipts and expenditures.

When respondent requested documentation that the Trustee deemed unreasonable, the trial court appointed a discovery referee in February 2010. The referee was empowered to make recommendations to the court on the Trustee's claim that some documents were privileged. The referee ordered the Trustee to produce certain

7

documents; however, the referee rejected respondent's demand for tax returns, on the ground of privilege, and ordered respondent to pay the Trustee's legal fees.

In March 2010, the Trustee filed a Trust accounting covering May 1, 2005 to December 31, 2009. The accounting showed that the Trustee paid himself trustee's fees of $6,750 every three months until January 2007; from 2007 to July 2008, he paid himself $10,500 every three months. On May 20, 2010, respondent filed objections to the accounting. Respondent objected to legal fees paid to the Trust attorney over the four-and-one-half-year accounting period; to the trustee's fees paid to the Trustee; and to expenditures made by the Trustee. In a supplement to the accounting, the Trustee stated that the fee for his services was 1 percent per year based on the value of real property under management. He did not charge for managing cash, or for commercial property management, or for participating in the Cardenas litigation. With respect to attorney fees, the Trustee stated that several firms performed services in connection with Trust administration and the Cardenas litigation.

In October 2010, the trial court set a trial on respondent's objections to the Trustee's accountings. In his trial brief filed in February 2011, respondent for the first time claimed that he was not served with the 2005 First Account. The Trustee replied that respondent's claim was barred by the statute of limitations.

## THE TRIAL COURT'S JUDGMENT

In October 2012, the trial court found that the Trustee breached his fiduciary duties, surcharged him, and suspended him as trustee. The court decided to reopen the First Account "[b]ased on the fact that no final order approving this account was signed." The Trustee promptly appealed from this order.

The trial court issued a statement of decision on January 4, 2013. The court identified two petitions at issue during trial: the *trust* accounting for May 2005 to December 2009, filed on March 16, 2010; and the *estate* accounting filed in September 2009. The court surcharged the Trustee $1,264,905. The court entered judgment for respondent on February 15, 2013. A second appeal was taken on March 4, 2013. The two appeals are consolidated.

8

## DISCUSSION

### 1. Appealability

An appeal may be taken from orders settling a fiduciary's account; fixing the payment of the fiduciary's compensation; and surcharging, removing, or discharging a fiduciary. (Prob. Code, § 1300, subds. (b), (f), (g).)[5]

### 2. The Limitations Period for Challenging the Trustee's Actions

#### a. *The Statute of Limitations*

The Trust contains limitations on beneficiary challenges and trustee liability. Pursuant to Section 9 of the Trust, unless a beneficiary delivers "a written objection to the Trustee within sixty (60) days of the mailing of Trustee's account, postage prepaid, the account shall be deemed settled, and shall be final and conclusive with respect to transactions disclosed in the account as to all beneficiaries of the Trust . . . . After settlement of the account by reason of expiration of the sixty (60) day period referred to above, or by agreement of the parties, the Trustee shall no longer be liable to any beneficiary of the Trust . . . in respect to transactions disclosed in the account except for the Trustee's intentional wrongdoing or fraud." (Section 9.)

Notably, Section 9 does not require that the beneficiary *receive* the account, only that it be *mailed*. A proof of service shows that the First Account was mailed to respondent in San Diego and filed with the court on August 5, 2005. Respondent did not object to the First Account until 2011, six years later.

Respondent argues that Section 9 "is nullified" by statute. He is correct that the Probate Code gives beneficiaries 180 days to object to accountings, even if the Trust specifies a shorter period of time, in this instance, 60 days. (§ 16461, subd. (d).) The statute also requires that beneficiaries be given written notice, in boldface type, of their right to object. (§ 16461, subd. (c)(3).) These provisions apply to all accounts and reports submitted after January 1, 2005. (§ 16461, subd. (j).)

---

[5]     All undesignated statutory references in this opinion are to the Probate Code.

9

Even if section 16461 "nullifies" Section 9 of the Trust, as respondent suggests, the trial court found that respondent did not receive the First Account when it was mailed in 2005. When there is no receipt, a statutory three-year time period applies in which to institute a proceeding against the Trustee: "[I]f a beneficiary does not receive any written account or report, the claim is barred as to that beneficiary unless a proceeding to assert the claim is commenced within three years after the beneficiary discovered, or reasonably should have discovered, the subject of the claim." (§ 16460, subd. (a)(2).)

A beneficiary need not be notified of the content of an accounting to be put on notice of a claim: the limitations period is triggered even without written notice if the beneficiary "discovered or reasonably should have discovered" the existence of a claim. (*Noggle v. Bank of America* (1999) 70 Cal.App.4th 853, 858-859 (*Noggle*).) Section 16460 imposes "a duty of inquiry when sufficient information was received by [beneficiaries] to put them on notice of action"; the duty of inquiry exists even when the wrongdoer is a fiduciary. (*Noggle*, at p. 860, fn. 5.) Thus, if beneficiaries could calculate the market value of trust assets and see that there was no growth in principal, the three-year statute begins to run because there was no real dispute about what they knew, or when they knew it, but only the effect of that knowledge. (*Id.* at pp. 860-861.)

Respondent maintains that the trial court may find a breach of fiduciary duty by exercising its power to supervise trust administration. (§§ 17200, 17206; *Schwartz v. Labow* (2008) 164 Cal.App.4th 417, 427-428 [court may remove a trustee who petitions to settle an account, based on objections to the account from the beneficiaries].) The court's power to resolve controversies over the administration of estates and trusts does not empower it to nullify a statute of limitations. The Legislature has declared that a beneficiary has three years to institute a claim against a trustee for mismanagement of assets, once the beneficiary discovers or reasonably should have discovered his claim. The courts cannot ignore section 16460 and revive stale claims.

   b. *The Limitations Period Expired on the Sale of Pickwick*

Respondent claims nonreceipt of the First Account, though his bench brief acknowledges "the proof of service that exists on the Accounting show[s] that it was

mailed to Mr. Rael personally."[6] Respondent told the trial court that his nonreceipt of the First Account prevented him from challenging the Trustee's sale of Pickwick for $425,000. The property sold to the tenant, without being offered on the multiple-listing service, and respondent argued that the price was too low. The Trustee countered that the time for challenging the sale long ago expired. The trial court found that respondent did not receive the First Account, and surcharged the Trustee $375,000 because he sold Pickwick "for less than market value."

The Trustee's attorney testified that respondent was served five times with the First Account and related documents: proofs of service were filed with the court each time. While acknowledging this testimony, the trial court deemed it "not credible" and found that respondent "did not receive the accounts allegedly mailed to him." The court reasoned, circumstantially, that respondent would not have retained an attorney in 2008 to obtain a copy of the First Account, if respondent had received it earlier. We must defer to the trial court's credibility finding.

In the end, respondent's receipt or nonreceipt of the First Account is moot with respect to the sale of Pickwick. His claim is barred by the statute of limitations specified in section 16460.

Respondent testified that he learned of the sale of Pickwick in March 2004, one day after escrow closed. Respondent learned that the Trustee "had sold for $425,000 and [ ] my first question to him was 'has it closed escrow yet?'" Respondent "was surprised to hear that that house was gone, actually no longer in possession of the trust. I asked [the Trustee] about the other properties, and [at] that time he made a reference that he had sold quite a few properties." Respondent told the Trustee "that I was actually pretty shocked that the residential and some of the other properties . . . were gone and had been

---

**6** The record contains proofs of service showing that the First Account and the notice of hearing on the Trustee's petition to confirm the First Account were sent on August 5 and 8, 2005, to respondent's home, to his sisters, to Cardenas, and to several lawyers. There is no claim that Cardenas, or the other beneficiaries, or their lawyers failed to receive the First Account. In fact, Cardenas filed objections to it.

11

sold." Respondent "was very concerned about the sale and I said I wanted the records, whatever records he could provide on the sales of the individual properties."

Respondent asked the Trustee in March 2004 "for an accounting of what was left in the trust." Respondent added, "After we learned of the Pickwick sale, we were all pretty shocked that the properties . . . had been sold and at that time, I personally told Davis back in '04 that we didn't want anything else sold." Respondent recalled receiving a copy of the March 18, 2004 letter from the Trust attorney stating that respondent "raised questions with the Trustee regarding the sale price" of Pickwick. Respondent states that he waited until late-2008 or early 2009 "to follow up with Davis and Attorney Brown on [respondent's] previously unanswered requests for Trust information."

It is undisputed that respondent was "surprised," "shocked," "very concerned," and "raised questions" about the sale of Pickwick and other properties, concerns that arose *one day* after escrow closed. Respondent did not act on his concerns, apart from demanding records of the sale and an accounting. Respondent concedes that he waited four years (2004 to 2008) to follow up on his unanswered questions about the sale.

Given the undisputed facts, we find as a matter of law that respondent was under a duty of inquiry because he received sufficient information to put him on notice, in March 2004, that the Trustee may have breached his fiduciary duty by selling Pickwick for $425,000. Respondent's inaction for seven years (2004 to 2011) was manifestly unreasonable in light of his own intelligence or information about the sale of Trust property. (*Czajkowski v. Haskell & White, LLP* (2012) 208 Cal.App.4th 166, 175.) The cases respondent cites requiring actual discovery are inapposite, because the limitations period in section 16460 begins when the beneficiary "discovered, *or reasonably should have discovered*" a claim: respondent's case law does not involve the plain language of section 16460.

Section 16460 applies to all breaches of trust, even when the beneficiary receives no written account or report. (*Noggle*, *supra*, 70 Cal.App.4th at p. 859.) The statute "obligates a beneficiary to act within three years after receipt of information sufficient to permit discovery of a claim," even if the trustee is under a continuing fiduciary duty. (*Id.*

12

at p. 860.) It is not the intent of the Legislature to "permit a beneficiary to wait forever to pursue a claim" while ignoring suspicions of wrongdoing. (*Ibid.*) Once the plaintiff becomes aware of facts that would arouse the suspicions of "a reasonably prudent person," he is charged with knowledge of the facts that would have been revealed in an investigation, regardless of whether the defendant is under a fiduciary obligation to plaintiff. (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874-875.)

Respondent discovered or reasonably should have discovered his claim in March 2004, when he raised questions with the Trustee and was "very concerned" about the sale of Pickwick. He had a duty to inquire further, but instead chose to sleep on his rights. The time to act expired in March 2007. His claim against the Trustee came years too late. The trial court was statutorily barred from surcharging the Trustee $375,000 on the 2004 sale of Pickwick.

### c. *Surcharge for Fees*

The court surcharged the Trustee for "overpaid" Trustee's fees and attorney fees from the First Account. As discussed above, the trial court accepted respondent's testimony that he did not receive the First Account or the notice of hearing on the First Account, both sent to his correct address in August 2005. Respondent did not claim nonreceipt of notices continuing the hearing on the First Account.

Significantly, respondent did not deny receipt of Cardenas's objections to the First Account, which were served on respondent on October 25, 2005. He testified, "I can't recollect if I received it or not. It's been a long time." Among other things, Cardenas contended that the Trustee and his attorney charged excessive fees and sold Trust property below market value. She wrote, "the trustee's fees are excessive in that the [Trustee] has not accounted [ ] for his time allegedly spent administering the Trust."[7]

A letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail. (Evid. Code, § 641.) This presumption affects

---

[7]     Respondent does not discuss the Cardenas objections in his brief.

the burden of producing evidence. (Evid. Code, § 630.) "The effect of a presumption affecting the burden of producing evidence is to *require the trier of fact to assume the existence of the presumed fact* unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate." (Evid. Code, § 604, italics added.)

"For example, if a party proves that a letter was mailed, the trier of fact is required to find that the letter was received in the absence of any believable contrary evidence. However, if the adverse party *denies* receipt, the presumption is gone from the case." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code, § 604 (2004 ed.) p. 289, italics added.) An employee for Cardenas's attorney attested that she placed envelopes addressed to all beneficiaries (including respondent) in the United States mail, creating a presumption that it was received by respondent. (*Bonzer v. City of Huntington Park* (1993) 20 Cal.App.4th 1474, 1478-1479.) Respondent's inability to recollect receipt of Cardenas's objections to the First Account is not evidence rebutting the presumption in Evidence Code section 641. The presumption requires us to find—absent any contrary evidence—that respondent received not only the objections from Cardenas, but the notices continuing the hearing on the First Account, as well.

In short, even if respondent was unaware of the documents filed and served in August 2005, he presumptively received Cardenas's objections to the First Account in October 2005, alerting him that (1) an accounting was filed, (2) the Trustee and Trust attorney charged excessive fees, and (3) Trust property was sold for less than market value by the Trustee's sister. Cardenas's objections to the First Account would arouse the suspicions of a reasonably prudent person that further investigation was required regarding the existence of the First Account. (*Miller v. Bechtel Corp.*, *supra*, 33 Cal.4th at p. 875.) Respondent had inquiry notice that he needed to obtain a copy of the First Account—from the Trustee, the Trustee's attorney, his sisters, or Cardenas—and learn whether the Trustee did, in fact, charge excessive fees. Instead, respondent once again

14

chose to sleep on his rights, as he did in 2004 when notified of the Trustee's sale of real property. If anything, Cardenas's objections only reconfirmed what respondent suspected in March 2004, when he raised questions about the sale price of Pickwick.

Respondent took no action to obtain the First Account or investigate the propriety of the fees charged to the Trust after receiving Cardenas's objections in October 2005. The trial court failed to acknowledge that respondent presented no evidence to rebut the presumption that he received the objections: this required the court to find that respondent received the objections. (Evid. Code, §§ 604, 641.) Respondent's breach of duty challenge to the fees is barred by the statute of limitations because he discovered or reasonably should have discovered his claim about excessive fees in 2005. (§ 16460.)

It is irrelevant that respondent finally awoke and began to seek the First Account in 2008 or 2009.[8] The statutory limitations period began to run when he became aware of facts that should have provoked an investigation. Respondent cites no evidence that the Trustee intentionally concealed the First Account from respondent, undermining respondent's argument that the Trustee should be equitably estopped from asserting a limitations defense. The court did not find that the Trustee never sent the document, only that respondent did not receive it, for whatever reason.

The trial court misunderstood section 16460. It thought, incorrectly, that it could adjudicate respondent's breach of duty claim at any time, regardless of the statute of limitations, because no court approved the First Account. It also thought, incorrectly, that because respondent's attorney did not obtain the First Account until 2009, respondent's claim in 2011 was timely. Respondent discovered the improper sale and excessive trustee's fees (1) in 2004, when he learned of the Pickwick sale, and (2) in

---

[8]     Actually, a billing statement and declaration from respondent's attorney show that respondent began to demand Trust accountings on December 4, 2007. This is more than three years before respondent objected to the First Account. In 2008, respondent received "a draft of I believe it was a second accounting." Receipt of a "second" account would alert a prudent person to the existence of a "first" account, yet respondent did not object to the First Account until 2011.

15

2005, when he received Cardenas's objections to the First Account. At that point, the limitations period was triggered. (*Noggle*, *supra*, 70 Cal.App.4th at p. 860, fn. 5.)

## 3. Surcharge of Trustee's Fees

In his trial statement, respondent asked the trial court to "[s]urcharge Trustee an amount to render his fees reasonable in light of his mishandling of his trusteeship and his abandonment of his fiduciary duties to the Beneficiaries." Respondent submitted an "Objector's Summary" to the trial court, asking that the amount of the surcharge be $170,000. Respondent listed the "Total Trustee's Fees" as follows: $72,485 for the First Account and $152,250 for the second account, for a total of $224,735. He also listed $34,648.42 as statutory fees. This is identical to the fees the Trustee listed in the First Account and second account.

The trial court somehow concluded that the Trustee was paid $345,034, and surcharged the Trustee $277,834. This is $107,000 more than the surcharge respondent requested. More incredibly, it exceeds what the Trustee charged. It is a manifest abuse of discretion to order a trustee to refund not only every dime that he was paid, but to also "refund" trustee's fees he never received. (*Estate of Gilliiland* (1971) 5 Cal.3d 56, 59 [court's determination of trustee compensation may be overturned where there is a manifest abuse of discretion].)

We cannot pretend to understand the trial court's mathematical formulations. The court lumped multiple account periods together. It calculated the fee as "672 hours at $100 per hour for a total of $67,200," and assumed that the Trustee spent 12 hours per month on the matter, or 144 hours annually. A trustee is entitled to "reasonable compensation" when the trust is silent on the issue. (§ 15681.) A trustee's fee of 3/4 of 1 percent of all trust assets (not just real property) is considered "reasonable." (*Estate of Taylor* (1970) 6 Cal.App.3d 16, 21-22.) It is unclear how the court arrived at $100 per hour and 12 hours per month, inasmuch as the fee that decedent and his attorney assented to before the Trustee agreed to become trustee was 1 percent of hard assets. The Trustee did not keep a record of his hours in light of his arrangement with decedent.

16

The Trustee began service in 2002, when decedent was a conservatee; he was removed as trustee in 2012. Yet the trial court apparently credited the Trustee with 4.6 years of service, not 10 years. (672 total hours divided by 144 hours per year is 4.6.) For six years, from 2003 to 2009, the Trustee legitimately and successfully defended against litigation instituted by Cardenas and reached a settlement with her that benefited respondent and his sisters.

The trial court's reasoning and mathematics cannot be sustained. The case must be remanded for a new trial on the issue of the Trustee's fee for the period beginning May 1, 2005, until the Trustee's appointment was suspended by the trial court in October 2012.[9] While the court is not obliged to accept the Trustee's fee of 1 percent (*Estate of Nazro* (1971) 15 Cal.App.3d 218, 221), the court must base its determination on some discernible reason.[10] Compensation may be reduced or denied where a trustee acts negligently or in breach of trust; however, "in the absence of fraud, personal benefit by the trustee, or loss to the beneficiaries, the trial court may only deny compensation for services attributable to [a] mismanaged asset." (*Estate of Gump* (1991) 1 Cal.App.4th 582, 597.) We reiterate that the Trustee's fee of $72,485 from the First Account period (September 2002 to April 30, 2005) cannot be reduced or surcharged because the statute

---

[9] The Trustee may seek a new trial before a different judge. (Code Civ. Proc., § 170.6, subd. (a)(2); *Stubblefield Construction Co. v. Superior Court* (2000) 81 Cal.App.4th 762, 765 [party may disqualify the former judge reassigned to the case if there is a retrial of issues]; *State Farm Mutual Automobile Ins. Co. v. Superior Court* (2004) 121 Cal.App.4th 490, 496-497 [disqualification available on remand for an evidentiary hearing and factual determination after a bench trial in a civil action where the judgment was reversed on appeal].)

[10] To determine reasonable compensation, the court considers the success or failure of the trustee's administration; any unusual skill or experience the trustee brought to his work; his fidelity or disloyalty; the amount of risk and responsibility assumed; the time consumed; the custom in the community; the character of the work, whether routine or involving skill and judgment; any estimate from the trustee of the value of his work. (*Estate of McLaughlin* (1954) 43 Cal.2d 462, 467-468.)

17

of limitations for challenging those fees expired years before respondent made a claim of wrongdoing.

## 4. Surcharge of Attorney Fees Paid to the Trust Attorney

The trial court was barred from surcharging the Trustee for attorney fees from the First Account, which respondent was under inquiry notice to investigate starting in October 2005, but did not object to until 2011. The time period for questioning the attorney fees incurred from 2002 until April 30, 2005, lapsed while respondent slept on his rights.

Trust Attorney Brown requested fees of $358,182.17 for his work on Trust matters from May 1, 2005 to December 31, 2009. During this period, Cardenas's claim for one-third of the Trust went to trial. The Trust prevailed against Cardenas at trial and on appeal, then negotiated a settlement with Cardenas in 2009.

The trial court reviewed billing statements submitted by Trust Attorney Brown. For the period running from May 1, 2005 to December 31, 2009, the trial court allowed $88,162 for Trust administration legal work, plus $184,121.87 for work performed on the Cardenas litigation, plus costs of $2,980.30. The total allowed amount for these three categories is $275,264.17.

The Trustee argues that the trial court abused its discretion by disallowing some of the fees charged by Trust Attorney Brown. The court disallowed the fees because (1) it could not determine from Brown's billing statements what services were rendered on behalf of the Trust, and (2) Brown unreasonably opposed respondent's petitions to compel the Trustee to distribute Trust assets, produce documents, and cease paying a family support allowance to Cardenas, incurring unnecessary fees when respondent's petitions were granted.

Trustees should incur and pay legal expenses that are reasonable in amount and appropriate to the purposes of the trust. (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 268.) It is imperative that records support the trustee's contention that the trust should pay disputed legal fees. (*Ibid.*) We review the trial court's determination for an abuse of discretion. (*Id*. at pp. 268-269.)

Here, the trial court was not convinced that unexplained entries for "telephone to client" and charges to oppose some of respondent's petitions were for the benefit of the Trust. Brown had an opportunity to explain the charges, but did not succeed. "If counsel cannot further define his billing entries so as to meaningfully enlighten the court . . . then the trial court should exercise its discretion in assigning a reasonable percentage to the entries, or simply cast them aside." (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689.) The court's findings that Brown moved too slowly to wrap up the Cardenas litigation and distribute Trust assets, or unreasonably opposed respondent's efforts to obtain information about the Trust, thereby incurring greater expense for the Trust, are not an abuse of discretion.

While the trial court did not abuse its discretion in reducing the amount of attorney fees for the accounting period after May 1, 2005, the judgment contains a serious error. The court should have subtracted the allowed amount of $275,264.17 (Brown's reduced fees) from $358,182.17 (Brown's total fees) for the relevant period, and arrived at a surcharge of $82,918. Instead, it surcharged the Trustee $199,967. This means the trial court impermissibly surcharged 100 percent of Attorney Brown's fees of $117,048.36 from the First Account (2002 to April 30, 2005). We order that the judgment be corrected to show that the Trustee is surcharged in the amount of $82,918 for the fees paid to Trust Attorney Brown.

## 5. Surcharge Imposed on the Trustee for Respondent's Fees and Costs

Respondent sought to recover attorney fees and costs he incurred. A beneficiary must bear his own attorney fees in contesting an accounting, even when successful. (*Estate of Bonaccorsi* (1999) 69 Cal.App.4th 462, 473.) An exception exists only if "the court determines that the trustee's opposition to the contest was 'without reasonable cause and in bad faith'" under section 17211. (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 924.) Reasonable cause is synonymous with probable cause to believe that the trustee's defense is tenable: it is lacking if any reasonable attorney would agree that the trustee's opposition is "totally and completely without merit." This is "a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are

19

extremely unlikely to succeed." (*Id.* at pp. 926-927.) "If there is no dispute as to what facts were known or if the factual dispute is not material to the probable cause determination, the existence of probable cause is a pure question of law." (*Id.* at p. 927.)

With regard to respondent's request for a surcharge, the trial court found that the Trustee "withheld the personal property from [decedent's] safe deposit box in bad faith"; if the Trustee "had properly administered the Trust, the distribution of the trust assets should have been completed years before the Petition was filed"; and respondent was threatened by Trust Attorney Brown that respondent would not get anything from the Trust. The court surcharged the Trustee $317,912 "for bad faith defense of the accountings," citing the Trustee's "significant delays" in distributing Trust assets.

The trial court may award attorney fees to beneficiaries who must petition the court when a trustee fails to carry out the terms of a trust by distributing trust assets. (*Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1598-1599.) In this instance, most of the delay in distributing Trust assets was due to the litigation brought by decedent's wife to obtain one-third to one-half of the Trust assets, which lasted from 2003 until 2009.

In February 2009, Cardenas agreed to settle her remaining claims against the Trust for $137,000, and respondent agreed to this arrangement. Two months later, in April 2009, the Trustee petitioned the trial court to approve the settlement, and respondent preemptively petitioned to compel the Trustee to distribute Trust assets. In May and June 2009, respondent, Cardenas, and the other beneficiaries informed the court that they approved of the proposed settlement. The court signed an order approving the settlement in June 2009, at which time distribution of assets began.

The trial court's finding that Trust assets should have been distributed to respondent and his sisters "years before" is defied by the history of the case. Respondent benefitted from the Trustee's defense of the Cardenas suit. If the Trustee had distributed Trust assets while the Cardenas litigation was pending, and Cardenas had prevailed, the Trustee would have been in serious trouble for prematurely distributing assets before the courts finally identified the Trust beneficiaries. Respondent's petition to compel a

20

distribution of assets before the trial court signed off on the Cardenas settlement was premature and unwarranted.

The preparation for and trial of respondent's belated objections to the First Account cannot be recouped. The Trustee reasonably opposed respondent's untimely breach of duty claims, and his assertion of a statute of limitations defense was well-taken. (§ 16460.) There is no basis for taking money from the Trustee for the unprofessional conduct of Attorney Brown in threatening respondent. A trustee may be held accountable for threatening beneficiaries, because it is a breach of trust and the trustee's duty of loyalty. (*Estate of Gump*, *supra*, 1 Cal.App.4th at p. 596.) There is no evidence that the Trustee threatened the beneficiaries.

As for respondent's objections to the second account, the Trustee partially prevailed on many of the issues in the trial court.[11] Some of the trial court's rulings in favor of respondent are being reversed on appeal for lack of evidence. Successful opposition to a claim shows that the Trustee had reasonable cause to oppose the claim. (*Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at p. 928.)

We reverse the trial court's award of $317,912 to reimburse respondent for his attorney fees under section 17211, and remand the matter for a new trial. If the court finds sufficient evidence to warrant it, attorney fees may be awarded for an unreasonable and bad faith failure to distribute Trust assets in a timely manner after the Cardenas settlement was approved in June 2009. (§ 17211; *Leader v. Cords*, *supra*, 182 Cal.App.4th at pp. 1598-1599.) No award is allowed for fees respondent incurred in his untimely challenge to the First Account: the Trustee had reasonable cause to assert the statute of limitations defense against respondent. Further, the trial court must consider

---

[11] For example, the trial court did not surcharge the Trustee at all (or only partially) for attorney fees incurred to compel accounts; for money paid to a contractor who worked on Trust property (respondent sought $146,635 and was allowed $50,000); for his failure to properly classify a promissory note (respondent sought $26,594 and received nothing); and for overpayment of a family allowance to Cardenas (respondent sought $31,500 and received $10,000).

21

whether any reasonable attorney would find the Trustee's opposition to respondent's objections to the second accounts "totally and completely without merit." (See fn. 11, *ante*; *Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at pp. 926-928.)

## 6. Surcharge for Failing to Evict a Delinquent Tenant

The trial court surcharged the Trustee for allowing a tenant to live in Trust property for 11 months without paying rent, thereby incurring a loss of $4,950 in rental income and forcing the beneficiaries to institute eviction proceedings at a cost of $2,500. Neither the Trustee nor respondent cite a single page of testimonial evidence relating to this issue. Instead, they cite the trial court's decision, which is not evidence. Absent any proof to the contrary, we shall assume that substantial evidence supports the trial court's finding that the Trustee negligently allowed the tenant to remain on Trust property and should have evicted her before the beneficiaries took over management of the property.

## 7. Surcharge for Using an Unlicensed Contractor

The Trustee used an unlicensed contractor named George Torres to make repairs at a Trust-owned hotel, paying Torres $146,653. Respondent sought to recoup this entire amount from the Trustee. Instead, the trial court surcharged the Trustee $50,000 for hiring the unlicensed contractor. The surcharge is supported by substantial evidence. Torres failed to apply for proper permits for his plumbing work. The testimony from respondent's experts established that Torres's work was substandard, so that "the whole plumbing system is compromised." The Trustee did not get bids from licensed plumbers and never questioned Torres's bills. The Trustee was negligent in hiring an unlicensed and incompetent plumber to work on an old building that had serious plumbing problems. The surcharge was justified.

## 8. Surcharge for Overpaid Family Allowance

The trial court surcharged the Trustee for overpaying Cardenas $10,000 in court-ordered family allowance. The family allowance had to continue until the court terminated it. The Trustee paid Cardenas the monthly family allowance of $3,700 through February 2009, when he reached a settlement with Cardenas. The settlement, by its terms, was "conditioned upon issuance of orders approving it." While a petition was

22

pending before the trial court for approval of the settlement and termination of the family allowance, the Trustee paid Cardenas $10,000. In June 2009, the trial court signed an order approving the settlement and formally terminating the family allowance. Once the court approved the settlement and the termination of the family allowance, the Trustee remitted $129,534 to Cardenas: this was the balance owing on the settlement amount of $137,069 minus the $10,000 payment made while the petition was pending, plus interest.

The trial court improperly surcharged the Trustee. The $10,000 was not an overpayment of family allowance; rather, it was an initial remittance on the Trust's obligation to pay Cardenas $137,000 to settle her claims. The Trust was not harmed or cheated by paying Cardenas $10,000 on its $137,000 debt to her: the $10,000 was deducted from the court-approved cash distribution made to Cardenas pursuant to the settlement terms. We reverse the $10,000 surcharge. The evidence does not support a conclusion that Cardenas was overpaid or the Trust was harmed.

## 9. **Surcharge for Bank Fees**

The trial court surcharged the Trustee $15,221 for "bank charges," finding that the Trustee "could not explain why these charges were incurred and the evidence is insufficient for the court to determine that they were necessary or appropriate or were of benefit to the trust." The Trustee contends that the "ruling impermissibly shifts the burden of proof from Rael to Davis." As respondent points out, the Trustee misstates the rule. Trustees must "prove every item of their account by 'satisfactory evidence'; the burden of proof is on them and not on the beneficiary; and any doubt arising from their failure to keep proper records, or from the nature of the proof they produce, must be resolved against them." (*Estate of McCabe* (1950) 98 Cal.App.2d 503, 505.) Because the Trustee does not cite to any proof in the record that the bank charges were necessary and unavoidable, the surcharge was properly imposed.

The Trustee also challenges a surcharge of $11,521 for early withdrawal penalties on certificates of deposit: the court found that the Trustee "did not explain why he had to liquidate the time deposits." At trial, the Trustee stated that he liquidated the CD's because he "needed to raise money," but he could not recall the reason. The Trustee's

deposition was read, in which he stated that the reason was "to pay additional tax to the IRS." The Trustee added, "I thought it was in the best interest that we get the government paid in a timely manner."

The trial court's finding is belied by the Trustee's testimony: he did, in fact, explain when he liquidated the CD's. The Trustee cited the pages of his testimony relating to his reason for terminating the CD's. The burden then shifted to respondent to cite contrary pages from the record demonstrating that the Trustee's reasons were fallacious. Respondent does not cite any evidence—only the trial court's decision—as proof that the Trustee should have used other funds to pay the taxes.

Respondent asks us to speculate that there might have been adequate liquid assets with which to pay the taxes due the IRS, or that the CD's might have matured had the Trustee only waited a few days. Reviewing courts do not assume that somewhere, among thousands of pages in the record, is supporting evidence. If there is evidence in the record, respondent should have cited it. Though we draw "every reasonable inference from the evidence tending to establish the correctness of the trial court's decision" (*Estate of Beard* (1999) 71 Cal.App.4th 753, 779), respondent has not cited any evidence establishing the correctness of the trial court's decision. We reverse the surcharge of $11,521 because the Trustee explained that he incurred the penalty by liquidating CD's to pay the IRS. No evidence shows that the Trustee's actions were unreasonable.

## 10. **Deferred Rulings**

In its judgment, the court listed six items as "possible additional surcharges" against the Trustee.[12] In his trial statement, respondent's list of contested issues included

---

**12** The deferred issues are (1) "improperly paid Estate taxes"; (2) "Estate tax refunds to which the Estate would have been entitled but Mr. Davis did not obtain"; (3) "Any and all improperly paid Trust taxes"; (4) "Trust tax refunds to which the Trust would have been entitled but Mr. Davis did not obtain"; (5) "improperly accounted-for monies that were deposited to or withdrawn from Charles Schwab"; and (6) "Any matters arising out of or relating to final accounts for the period of administration" for decedent's estate and the Trust.

Trustee wrongdoing with respect to the payment of estate and trust taxes; his failure to seek a refund of overpaid taxes; and unexplained transactions totaling over a million dollars in an account at Charles Schwab. These are issues the court deferred. The Trustee argues that the court's plan to issue a future resolution of the deferred issues is improper, because it allows respondent to assert the same claims in a future action.

Matters that a court expressly leaves open and refuses to determine are not res judicata. (*Cason v. Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 141; *Estate of Doyle* (1962) 202 Cal.App.2d 434, 439; *Lathrop v. Kellogg* (1958) 158 Cal.App.2d 220, 224; *Fairchild v. Bank of America* (1958) 165 Cal.App.2d 477, 484.) When a trial court reserves issues for future determination, there is no bar to the resolution of those issues. (*Capitol Chevrolet Co. v. Lawrence Warehouse Co.* (9th Cir. 1955) 227 F.2d 169, 174. See Code Civ. Proc., § 1911 ["[t]hat only is deemed to have been adjudged in a former judgment which appears upon its face to have been so adjudged . . ."].) We express no opinion as to whether the respondent's deferred claims are barred by a statute of limitations.

## DISPOSITION

The surcharge of $375,000 for the sale of real property on Pickwick Street is reversed and cannot be retried. The surcharge of $277,834 in Trustee's fees is reversed and the issue is remanded for a new trial on the issue of Trustee's fees *only* for the period extending from May 1, 2005 to October 2012. The Trustee's fee of $72,485 for the period extending from 2002 to April 30, 2005, cannot be reduced or surcharged. The trial court is ordered to amend the judgment to reduce the surcharge for attorney fees paid to the trust attorney from $199,967 to $82,918. The award of $317,912 to Mark Rael for his attorney fees and costs is reversed and remanded for a new trial *only* on the issue of whether David Davis acted unreasonably and in bad faith by failing to timely distribute trust assets after the Cardenas settlement was approved by the trial court in June 2009, or unreasonably opposed Rael's objections to the second accounting. The surcharge of $7,450 for failure to evict a nonpaying tenant is affirmed. The surcharge of $50,000 for using an unlicensed contractor who caused plumbing damage is affirmed. The surcharge

25

of $10,000 for overpaid family allowance is reversed and cannot be retried.  The surcharge of $15,221 for unexplained bank charges is affirmed.  The surcharge of $11,521 for early withdrawal penalties is reversed and cannot be retried.

The parties to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        BOREN, P.J.

We concur:


        ASHMANN-GERST, J.


        FERNS, J.*

_____

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.